In the United States Court of Federal Claims
No. 23-348
Filed: August 11, 2023
Reissued: August 30, 2023[†]

**DIGIFLIGHT, INC.,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*.

*Roderic G. Steakley*, Dentons Sirote PC, Huntsville, AL, with *Benjamin R. Little*, and *Jerome S. Gabig*, of counsel, for Plaintiff.

*Margaret J. Jantzen*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Deborah A. Bynum*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    Disappointed offerors count themselves as kings of infinite space even when their claims can be bounded in a nutshell.[1] Plaintiff DigiFlight, Inc. ("DigiFlight"), challenges the Army's award to Total Computer Solutions, Inc. ("TCSI"), to provide programmatic support for the Army's Utility Helicopter Project Office ("Project Office"). Broadly, DigiFlight claims that the Army failed to assess strengths for many aspects of DigiFlight and other offerors' proposals, disregarded the price evaluation criteria, violated the Competition in Contracting Act ("CICA"), incorrectly assigned strengths to the awardee, and failed to adequately document its trade-off analysis. But in a nutshell, DigiFlight's claims rest on legal requirements inapplicable to the simplified process used in this procurement: awarding a task order to a Blanket Purchase Agreement ("BPA") holder. The Court finds that DigiFlight's claims improperly impose the

---

[†] This Opinion was filed under seal on August 11, 2023. The parties filed their joint status report to propose any redactions of protected information on August 24, 2023. (ECF No. 35). Accordingly, the Court reissues the agreed-upon public version of this Opinion and Order.

[1] "I could be bounded in a nutshell and count myself a king of infinite space" is William Shakespeare's summation of a common characteristic in humans to define their surrounding as they like to see it and not necessarily as it actually is. William Shakespeare, Hamlet act 2, sc. 2.

requirements of traditional procurement on the more simplified process of Federal Acquisition Regulation ("FAR") Subpart 8.4 procurement. Accordingly, the Court denies DigiFlight's Motion for Judgment on the Administrative Record and grants the United States' Cross Motion for Judgment on the Administrative Record.

## I. Background

In June 2022, the Army sought programmatic support services for its Utility Helicopters ("UH") Project Office. (Administrative Record ("AR") 571, 1321, ECF No. 29-1). The Project Office is responsible for comprehensive life cycle management of the Army's UH fleet, such as the UH 60 Black Hawk Helicopter and Lakota Light Utility Helicopter. (*Id.*). Life cycle management involves overseeing the acquisition, development, modification, sustainment, and foreign military sales for such helicopters. (*Id.*).

The Army released a Task Order Request for Quotation ("TORFQ") to select an awardee among Expedited Professional and Engineering Support Services ("EXPRESS") BPA contract holders that would provide "programmatic support services" (or logistic support) to the Project Office at Redstone, Alabama for five years. (AR 571, 576). The TORFQ was competitively solicited under FAR Subpart 8.4 and provided that the awardee would be the offeror whose quotation provided "the best value to the Government." (AR 580). The TORFQ defined best value as providing "the greatest overall benefit," to the United States. (*Id.*) As with other best value determinations, the Army could "accept other than the lowest priced quotation" if it "reasonably determine[ed]" that the benefits of a higher price were warranted. (AR 580)

The Army evaluated quotes on three factors: technical expertise, risk mitigation and management, and price. (*Id.*). The TORFQ noted that technical expertise and risk mitigation and management were weighed equally, but both were of greater importance than price. (*Id.*). As the difference in evaluation results for technical expertise and risk mitigation and management decreased, the importance of price increased. (*Id.*).

The Army measured the first factor (technical expertise) by referencing relevant examples of experience that demonstrated a clear understanding and ability to perform the tasks in the performance work statement ("PWS"). (AR 580–81). Although the award required the capability to perform all PWS's requirements, the Army specifically highlighted that meeting the requirements in two specific paragraphs of the PWS (2.2.5 and 2.2.6) was "critical to evaluation of the Offeror's technical expertise." (AR 581). For these two paragraphs, the DigiFlight Team included the incumbent contractor. (Pl.'s Motion for Judgment on the Administrative Record ("Pl.'s Mot.") at 8, ECF No. 20).

PWS 2.2.5 stated that the contractor:

> Provides senior executive level support to the Utility Helicopters Project Office (UHPO) Project Manager and Deputy Project Manager regarding planning, coordination and synchronization of programs. Primary coordination point for internal operations to ensure strategic planning, staff actions, and synchronizations of efforts to maintain cost, schedule and performance objectives. Routinely prepares and execute senior staff level

>actions, coordinating or interacting with senior leadership from other higher, lower and adjacent staffs or commanders to accomplish tasks. This includes organizations and agencies within the U.S. Government, civilian industry and foreign interests.

(AR 586).

Likewise, PWS 2.2.6 noted that the contractor:

>Provides senior executive level support to the UHPO Project Manager on managing, coordinating and executing the mission, functions and activities of the Program Office. Coordinates and staffs requirements with subordinate organizations, Program Manager Office, Program Executive Officer (PEO) Office, and Assistant Secretary of the Army (Acquisition, Logistics and Technology) (ASA(ALT)). Manages coordination of PM conferences, ceremonies, and events. Participates and coordinates a wide variety of functions to include human resource management support, property accountability, facilities management and space utilization, administrative services, security, and administrative information technology. Performs complex administrative and technical services that directly affect the organization as a whole or represent a major segment of a program critical to the organization's ability to manage its mission.

(*Id*.).

For the second factor, the Army assessed risk mitigation and management by evaluating how it applied to (1) obtaining and retaining qualified personnel, (2) deploying the right team to perform the PWS requirements, and (3) effective management of the project. (AR 582). In its evaluation, the Army would assign a strength if it found that an aspect of an offeror's quote either had "merit or exceed[ed] specified performance capability requirements," in a way that was "advantageous to the Government during contract performance." (AR 584). The Army evaluated price for overall reasonableness. (AR 583). Critically, the TORFQ reiterated that "evaluation will be streamlined, with documentation kept to a minimum as described in FAR Subpart 8.4." (AR 572).

After the Army notified offerors that TCSI received the award[2] and that the Army had not assessed any strengths to DigiFlight's proposal (receiving an overall technical rating of Acceptable), DigiFlight submitted six debriefing questions to the Army. (AR 1325, 1337). The Army's response was brief: "your request is denied, and the information will not be provided." (Compl. Ex. 7, ECF No. 1).

## II.   Analysis

The Court reviews agency decisions under challenge in bid protest cases to determine if the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[2] Task Order W31P4Q-23-F-D001 was awarded to TCSI in the amount of $97,171,019.48.

accordance with law. 28 U.S.C. § 1491(b)(1),(4); 5 U.S.C. §§ 702, 706(2)(A). In other words, a procurement award may be set aside when the agency's decision (1) "lacked a rational basis" or (2) involved "a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). If either condition is met, the protestor must also demonstrate that it was prejudiced by the agency's error. *Sys. Stud. & Simulation v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). This is satisfied when the protestor shows that "there was a substantial chance it would have received the contract award" but for the agency's error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005).

    A. *The Army's failure to assign DigiFlight strengths for PWS tasks*

In Counts I to VI DigiFlight faults the Army for its failure to assign strengths to specific aspects of DigiFlight's proposal. (Pl.'s Mot. 13–26). Two of these Counts (I and IV) focus on the relevance of DigiFlight's incumbency for the work described in PWS 2.2.5 and PWS 2.2.6, respectively. (*Id.* at 13–19). In Count I, DigiFlight highlights its experience providing programmatic and logistical support "throughout the Army Aviation community," claiming it to be particularly relevant for PWS 2.2.5. (*Id*. at 13–15 (describing the experience as "extensively supporting" the Project Office's "Project Manager and Deputy Project Manager requirements for planning, coordination and synchronization of programs")). Similarly, in Count IV DigiFlight emphasizes its experience in "managing Army Aviation programmatic requirements for decades." (*Id.* at 22). In both instances, DigiFlight claims that these experiences offered such palpable advantages to the Army that a failure to assign a strength is tantamount to the Army acting arbitrarily and capriciously. (*Id.* at 16, 23).

In both cases, DigiFlight's arguments are limited to a mechanical recitation (in full-able format) of DigiFlight's proposal as it was presented to the Army, detailing its incumbency experience. (*See id*. at 15, 22–23). DigiFlight follows this recapitulation with a blanket statement that the "real advantages" reflected in those tables entitle DigiFlight to a strength, restates the proposal's definition of strength, and finishes with a conclusory reliance on the proposition that the Court will "sustain a protest where the administrative record does 'not provide a coherent and reasonable explanation' of an evaluation." (*Id*. at 17–18, 23 (citing *FFL Pro LLC v. United States*, 124 Fed. Cl. 536, 561 (2015)). However, DigiFlight ignores that, though it was not assigned a strength, the Army acknowledged the relevance of this experience. (*See* AR 1252 (noting that with respect to PWS 2.2.5 DigiFlight "indicated . . . experience that is relevant to this requirement including [DigiFlight's] support of the UH PMO, AAH PMO, CH PMO, MASPO, UAS, PEO AVN, SAMD, and over 50 FMS Partner Nations."); *see also* AR 1253 (highlighting DigiFlight's "development and coordination of specialized programmatic briefings range from Home-on-Home exchange meetings to engagements with DoD, ASA(ALT), and Congressional Staffers.")).

The Court reviews an agency's decision to assign strengths with the understanding that "an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006). The Court is especially cognizant to not disturb the agency's determination when the disappointed bidder's argument does nothing more than recite what was presented to the agency and ask the Court for a second opinion (without

4

fleshing out why that information renders the agency's determination wholly unreasonable). *See e.g.*, *Integrated Fin. & Accounting Sols., LLC v. United States*, 161 Fed. Cl. 475, 492 (2022) (rejecting an argument that was "simply a recitation of [the disappointed bidder's] performance on one of the predecessor contracts," without any explanation as to "how [that experience] exceeds the RFQ's requirements."). Counts I and IV run afoul of this standard.

Furthermore, DigiFlight does not sufficiently establish that an offeror's incumbency status should always be treated as uniquely important. *BayFirst Solutions, LLC v. United States*—the only Court of Federal Claims decision cited by DigiFlight on the issue of incumbency and strength assignments—did indeed involve a challenge to an agency's failure to assess the advantages of incumbency, but the resemblance ends there. 102 Fed. Cl. 677 (2012). *BayFirst* presents glaringly different facts than this case; there, the agency had to issue its solicitation *only* because the high-performing incumbent contractor, whose work the agency remained greatly satisfied with, no longer qualified as a small business. *Id*. at 681. Accordingly, the agency's procurement strategy was to ensure that incumbent personnel "would continue to serve in their current positions" under the new contract to the awardee. *Id*. To that end, the solicitation itself highlighted the importance of incumbency, explicitly requiring that "all current employees of [the incumbent contractor] be offered a position under any new contract" awarded. *Id*. It is only against that unique background and that specific solicitation's express emphasis on the advantages of incumbency that the Court admonished the agency's decision to not assign a strength to one bidder's plan to retain hundred percent of the incumbent personnel. *Id.* at 686–87. *BayFirst* therefore falls squarely within this Court's longstanding approach to striking down agency actions as arbitrary and capricious when those determinations plainly contradict the standards set by the terms of the solicitation. *See e.g., Bluewater Mgmt. Grp. v. United States*, 150 Fed. Cl. 588, 614 (2020) (agency evaluation must be "consistent with the [other] factors and procedures outlined in the solicitation.") (citing *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014)). Unlike *BayFirst*, nothing here obligated the Army to view the benefits of incumbency as uniquely advantageous in comparison to other potential benefits in this case. *See Integrated Fin.*, 161 Fed. Cl. at 492 (agency did not err by not assigning strengths to incumbent "because the RFQ [did] not disclose any advantage related to incumbency"). Consequently, the Court rejects DigiFlight's arguments that the Army improperly evaluated DigiFlight's incumbency experience.[3] DigiFlight's other arguments about the Army's failure to assign strengths fare no better.

In Counts II and V, DigiFlight argues that the Army failed to assign strengths for the Innovations and Discriminators in DigiFlight's proposal for PWS 2.2.5 and 2.2.6, respectively. (Pl.'s Mot. at 18–19, 24). Similarly, DigiFlight's Count III echoes that argument as to the Army's failure to assign a strength for DigiFlight's use of Enterprise Task Management Software to support the project management assignments. (*Id*. at 20–21). Finally, Count VI also focuses on

---

[3] The United States also disputes DigiFlight's incumbency claims on factual grounds, noting that "[t]he administrative record does not reflect that there is any incumbent for this procurement, and that "[i]n fact, the previous task order made under the AMCOM EXPRESS BPA was awarded to Quantitech, LLC." (Def.'s Reply at 15, ECF No. 27 (citing to AR 1321)). This factual dispute is worth noting, as it provides additional grounds to question DigiFlight's insistence that the Army irrationally overlooked clear benefits that automatically attach to incumbency status.

the Army's failure to assign a strength, this time as to DigiFlight's reliance on the Resource Optimization Tracking Repository. (*Id*. at 25–26).

These allegations suffer from the same defects as Counts I and IV; DigiFlight fails to flesh out the connection between the information recited directly from its proposal and TORFQ or the relevant PWS text which would render the Army's evaluation "wholly unreasonable." *CW Gov't Travel, Inc. v. United States*, 53 Fed. Cl. 580, 598 (2002) (providing the Court's task "is not to correct evaluation mistakes" but to determine "whether the conclusions . . . were wholly unreasonable given the undisputed facts on the record"). Critically, in the more demanding context of negotiated procurements, the Court's review of agency evaluations rests on the agency's "documented analysis" of the "*relative* strengths, deficiencies, significant weaknesses, and risks[.]" *Telos Corp. v. United States*, 129 Fed. Cl. 573, 577 (2016) (citing FAR 15.305(a),(a)(3)) (emphasis added). Here, however, DigiFlight's Counts I to VI do not contain any discussion of the *relative* merits of its technical proposal or juxtapose those with the awardee's proposal. (*See* Pl.'s Mot. 13–25). In each instance, DigiFlight merely copy-and-pastes the information offered to the Army and adds a conclusory recitation of the TORFQ's strength definition. (*Id.*). Without more, DigiFlight fails to meet its "heavy burden" showing that its claims represent more than mere disagreement with the Army's evaluation. *Impresa*, 238 F.3d at 1333.

Further, DigiFlight incorrectly equates the Army's decision to not elaborate on every aspect of DigiFlight's proposal with the failure to "provide a coherent and reasonable explanation" of an evaluation. (*See e.g.*, Pl.'s Mot. at 19, 23). Clearly, disappointed bidders always believe that "a more detailed analysis should have been documented," but as the Court has noted that is not "the issue for the Court to decide." *Sirius Fed. v. United States*, 153 Fed. Cl. 410, 423 (2021).

In the context of negotiated procurement, the Court has previously held that when "an agency is not faulting a particular approach to a task, or noting its superior quality, the Court cannot discern how the agency should be required to explain its finding—that the approach is merely adequate—in any detail." *InSpace 21 LLC v. United States*, 128 Fed. Cl. 69, 89 (2016). This principle applies even more forcibly in procurements under FAR Subpart 8.4, where even "far less is required" of the agency. *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51, 74 (2021) (citing *Telos*, 129 Fed. Cl. at 577); *see also*, FAR 8.404 ("parts 13 . . . 14, 15, and 19 . . . do not apply to BPAs or orders placed against Federal Supply Schedule Contracts").[4]

---

[4] DigiFlight's intermittent references to the Court's opinion in *DigiFlight Inc. v. United States*, 165 Fed. Cl. 588 (2023) ("*DigiFlight I*") are not helpful. In *DigiFlight I*, the Court correctly held that Subpart 8.4's focus on streamlined procurement does not mean that agencies "can provide almost no rationale for the decisions made on the technical evaluation." *Id*. at 607. Here, the record before the Court *does* include the Army's rationale for its technical evaluation, and DigiFlight's claim is not about the absence of documented rationale but the *contents* of that documented analysis. *DigiFlight I* does not support the proposition that Subpart 8.4 requires the agencies to "provid[e] sufficient documentation," as to why each supposed benefit "did not merit

Here, the Army found that DigiFlight demonstrated an adequate level of expertise and understanding of the requirements of PWS paragraphs 2.2.5 and 2.2.6. (AR 1252, 1325). The Army was operating in the context of a procurement that adopts a "more simplified and flexible approach," and "away from the more formal and rigorous procedures for negotiated procurements." *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010). As such, the Army did not disregard its obligations by not elaborating any further on its assessment of the aspects of DigiFlight's proposal laid out in Counts I to VI. *Telos*, 129 Fed. Cl. at 577 ("the [government] decision that must be reasonably articulated and supported in a post-award bid protest is the selection of the awardee, not every 'decision' that a proposed feature is unremarkable.").

There are numerous paths to successfully challenge an agency's failure to assign a strength. Disappointed bidders can show that the agency's evaluation was "objectively deficient," or demonstrate inconsistencies "with the treatment of an identical aspect of a competitor's proposal," *Telos*, 129 Fed. Cl. at 577, but in all instances the protestors cannot merely present the Court with the same information that was before the agency and hope for a different determination, for "[e]ven if the Court possessed the technical expertise to offer its own judgment, the Court lacks the authority to do so," under its highly deferential standard of review. *Tech. Innovation Alliance LLC v. United States*, 149 Fed. Cl. 105, 174 (2020). The Court's role is not to be the second set of eyes for every technical determination by an agency because that approach would allow the protestors to "unilaterally impose upon on an agency the duty to explain why any feature in its proposal was not found to be a strength, merely by disputing this determination." *Telos*, 129 Fed. Cl. at 577. For these reasons, the Court denies Counts I to VI pertaining to the Army's failure to assign strengths to aspects of DigiFlight's proposal.

### B. The Army's obligation to debrief

DigiFlight also argues that the Army was obligated to respond to its debriefing questions under DFARS § 252.216-7010.[5] (Pl.'s Mot. at 13, 19, 21, 23).[6] Subsection (a)(2)(ii) of that regulation states: "[t]he agency will respond in writing to timely submitted additional questions within [five] business days after receipt." DigiFlight maintains that the Army's noncompliance with the DFARS provision entitles DigiFlight to a tacit admission (or in the alternative an adverse inference) that the Army had no reasonable basis for not assigning a strength. (Pl.'s Mot. at 14).

---

being assessed as strengths." (Pl.'s Reply. at 8); *see also W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.").

[5] The DFARS is the Department of Defense's "implementation and supplementation of the FAR." *See* DFARS 201.301(a)(1).

[6] The Army's failure to debrief is incorporated in Counts I-VI of DigiFlight's brief. The Court addresses these together.

The United States argues that DFARS § 252.216-7010 was not adopted until December 2022—six months after the TORFQ's issuance on June 8, 2022. (Defendant's Cross-Motion for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 21, ECF No. 22). DigiFlight does not respond to this argument in its reply. (Def.'s Reply at 14, ECF No. 27; *see also* Pl.'s Reply, ECF No. 24). Without more, the Court declines to depart from the plain text of FAR 1.108(d) which mandates that FAR changes only "apply to solicitations issued on or after the effective date of the change." *See also IFONE NEDA Internet Serv. v. Army & Air Force Exch. Serv.*, 2022 U.S. Dist. LEXIS 198392 n.19 (S.D. Tex. Nov. 1, 2022) ("The DFARS should be read in conjunction with the primary set of rules in the FAR."). DFARS regulations operate alongside FAR 1.108(d)'s general rule. *See e.g.*, Defense Federal Acquisition Regulation Supplement; Reports of Government Property (DFARS Case 2005-D015), 72 FR 52293, 55294 ("In accordance with the convention at FAR 1.108(d), the IUID reporting requirements will apply to contracts resulting from solicitations issued on or after the effective date of this interim rule."); Defense Federal Acquisition Regulation Supplement: Definition of "Commercial Item" (DFARS Case 2018-D066), 88 FR 6578, 6579 ("In accordance with FAR 1.108(d), this rule will be applied prospectively."). Specifically, FAR 1.108(d)(2) and (3) allow contracting officers to amend solicitations or existing contracts to include regulatory changes that become effective after the solicitation or contract is issued. Some DFARS provisions explicitly reference FAR 1.108(d)(2), asking contractors to apply the rule change retroactively. *See e.g.*, Defense Federal Acquisition Regulation Supplement: Enhancement of Contractor Employee Whistleblower Protections (DFARS Case 2013-D010) ("In accordance with FAR 1.108(d)(3), contracting officers are encouraged to include the changes in these rules in major modifications to contracts and orders awarded prior to the effective date of this interim rule."). However, DFARS § 252.216-7010 does not provide that requirement. *See* Defense Federal Acquisition Regulation Supplement: Postaward Debriefings (DFARS Case 2018–D009), 87 FR 15808. Therefore, the Court finds that the DFARS § 252.216-7010 did not apply to the TORFQ at issue.

Even if FAR 1.108(d) did not control, DigiFlight fails to establish that DFARS § 252.216-7010 applies to this procurement. (*See generally* Pl.'s Mot.). DFARS 252.216-7010 is titled "Postaward Debriefings for Task Orders and Delivery Orders," and the regulation's introductory language indicates that its debriefing requirement shall be used "[a]s prescribed at [DFARS] 216.506-70(b)." DFARS 216.506-70(b), in turn, notes that such debriefing is required "in competitive negotiated solicitations and contracts . . . ." Subpart 8.4 procurements, including the procurement at hand, are distinguishable from negotiated procurements by design. *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 394 (1999); *see also* FAR § 8.404(a); AR 572 (noting that "this is a FAR 8.4 procurement and [] all eligible Offerors have already been awarded GSA Schedules, evaluation will be streamlined, with documentation kept to a minimum as described in FAR Subpart 8.4."). Accordingly, the Army was not obligated to respond to DigiFlight's debriefing request under DFARS § 252.216-7010.

### C. The Army's compliance with the price evaluation criteria

In Count VII, DigiFlight argues the Army failed to comply with evaluation criteria providing that the importance of price "will increase as the differences between the evaluation results for the other criteria decrease." (AR 580). However, this argument rests on a faulty assumption. As DigiFlight notes, the differences between DigiFlight and TCSI's proposals devolved "to the two strengths attributed to TCSI's proposal for the evaluation factor of technical

8

expertise." (Pl.'s Mot. at 27). Although DigiFlight disagrees with the Army's decision to assign these two strengths to TCSI, that does not change the fact that the Army's final determination did not hinge on price but rather on the difference in the assigned strengths. (*See* AR 1358 (noting that "there are significant differences between [TCSI's] evaluation results and those of the other Offerors," which left price as the "least important criteria."). Importantly, the TORFQ allowed the Army to elevate technical strength over price. (AR 580 ("When combined, both Technical Expertise and Risk Mitigation and Management, are significantly more important than price.")). Therefore, the Court interprets Count VII to challenge the Army's assignment of two strengths to TCSI.

First, the Army assigned TCSI a strength for proposing the role of the Operations Chief to meet the PWS 2.2.5 requirement of providing senior executive level support. (AR 914–20). DigiFlight's proposal did not include an Operations Chief, but DigiFlight argues that its proposal made clear that, functionally, its Program Manager ("PM") would perform duties equivalent to those of an Operations Chief. (Pl.'s Mot. at 27). Despite DigiFlight's insistence, the record indicates that DigiFlight and TCSI's proposals presented the Army with two distinct approaches to senior level management. For example, DigiFlight informed the Army that its PM would be "vested with the overall responsibility for performance and financial execution," as "the centralized manager in Huntsville," and continued to mainly highlight the PM's experience and record. (*See e.g.*, AR 742 ("Our proposed Team PM has over 35 years of extensive experience in managing USG and FMS programmatic support . . . ."); AR 745 (providing the Army with a letter of support from AAH Business Division Chief commending the PM for "executive strength, an unquestionable ethical and moral compass," and continued demonstration of "analytical reasoning . . . .")). In contrast, the Army highlighted TCSI's proposal for an Operations Chief by relying on description of exact roles and responsibilities that DigiFlight did not match in its PM proposal; in particular, the Army highlighted the following in assessing TCSI's Operations Chief:

> Specifically, the Offeror utilizes an Operations Chief who manages execution of the Project Manager's Strategic Plan with the support of an Operations Cell to support coordination and synchronization across the Utility Helicopter Project Manager's Office (UH PMO). The Operations Chief participates in weekly meetings, communicates with senior leaders, Division Chiefs, and the Product Managers (PdMs), Deputy Product Managers (DPdMs), and their functional chiefs to assess product status, upcoming events, emerging challenges, adherence to the strategic plan and support technical, business, and logistics priorities, prepare budgets, respond to Requests For Information (RFIs), and to answer taskers.

(AR 1327–28).

On its face, DigiFlight and TCSI's two approaches to senior executive level support are not "substantively indistinguishable," to call into question the Army's assessment of strength. *See Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290 (2022) (finding that the Court cannot reanalyze the assignment of strengths and weaknesses if the proposals are not "substantially indistinguishable"). Because the two proposals here highlighted different

characteristics of senior executive level support, the Court cannot "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372–73 (Fed. Cir. 2020); *see also* (AR 1359 (noting TCSI's "unmatched technical expertise in [supporting] the Senior Executive Service level employees.")).

The Army's assessment of TCSI's second strength implicates the same degree of discretionary authority. *See Office Design Grp.*, 951 F.3d at 1372–73. The Army assigned TCSI its second strength for its ability "to manage coordination of PM conferences, ceremonies, and events; to participate in and coordinate a wide variety of functions; and, to perform complete administrative and technical services." (AR 1329). DigiFlight recounts examples in its proposal that it believes meet this criteria: providing "graphics and technical support for the Black Hawk User's Conference," coordinating and participating "in military promotion ceremonies, Change of Charter events, award presentations, UH PMO all-hands, and retirement celebrations," designing, developing, delivering and managing "the execution of UH-60V training events to include LOG Demo, IKPT, IOT&E, and NET training of CCAD pilots," and others. (Pl.'s Mot. at 42–3). The Army instead found value in TCSI's "experience preparing, coordinating, and interacting with leaders across Army Aviation," with examples that are distinct from the experiences listed by DigiFlight, such as TCSI's support of "the UH-60V First Unit Equipped Ceremony for the National Guard Bureau[,]" its experience in managing coordination of conferences that the Army found to be "critical," like the Army Aviation Association of America Mission Solution Summit and the Association of the United States Army Annual Meeting & Exposition. (AR 1265, 1328). The Army also noted TCSI's experience with setting up Annual and Quarterly Project Office Team Building events and Town Halls. (*Id.*). DigiFlight argues that these two sets of experiences are "clearly comparable," but that is not enough for the Court to "second-guess the agency's discretionary determinations underlying its technical ratings." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Instead, the Court has held that protesters must demonstrate that the proposals at issue are effectively "indistinguishable for purposes of the evaluation," or otherwise the Court's reevaluation of each technical approach crosses the line and veers into the "minutiae," of the procurement process. *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017) (quoting *E.W. Bliss*, 77 F.3d at 449).

The Army's assignment of strengths reflects a subjective judgment and does not evince inconsistencies. *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (finding that agency action is irrational when it is so "implausible that it could not be ascribed to a difference in view or the product of agency expertise"). Because the Court rejects DigiFlight's argument that TCSI's proposal only offered a "marginal benefit," the Court finds that the Army did not depart from the solicitation's price evaluation criteria by awarding TCSI at a price premium. (AR 1359, 1351–60). Relying on the two assigned strengths, the Army noted that TCSI's proposal provided "more technical benefits than any other Offeror." (AR 1358). The Army acknowledged that TCSI's pricing was "significantly higher," than other offerors, but contrary to DigiFlight's argument, the Army believed that the price difference was justified because of the "cumulative benefit" of TCSI's proposal. (AR 1359). The Army's assessment of TCSI's proposal reasonably communicates the Army's finding that TCSI's approach, despite its higher price, can translate into higher returns for the Army in the long run. For example, the Army noted that TCSI's approach "increase[s] efficiency," "reduc[es] the risk of unsuccessful performance," "reduc[es] the need for rework and/or reproduction/duplication,"

and "the learning curve associated with the performance of both critical PWS paragraphs." (*Id.*). The record does not support DigiFlight's claim that the Army disregarded the price criteria.

### D. The Army's evaluation of proposals for source selection decision

Count VIII of DigiFlight's motion is predicated on the arguments raised in Counts I to VI and asserts that the source selection award was irrational because it relied on flawed evaluation of the proposals. (Pl.'s Mot. at 31). As the Court previously noted, the Army's evaluation of strengths and weaknesses does not reflect a defective pattern or inconsistent application of TORFQ standards. In its nine-page tradeoff analysis, the Army found that all eligible offerors had the adequate capacity and experience to perform the tasks but only rated TCSI as "good" for factor two—technical expertise and risk mitigation and management. (AR 1351–59). The Army noted that the strength differential was the "discriminating factor" that made TCSI the awardee, justifying the price premium. (AR 1353). The Army highlighted the unique characteristics of TCSI's offer which involved its approach to senior executive level support, and in managing and coordinating certain events that the Army has more familiarity with. (*Id.*). Although other offerors had adequate and maybe comparable experience, the Army found certain experiences that only TCSI had in its repertoire as "particularly advantageous" to the "programmatic requirements." (AR 1359); *Tech. Innovation All.*, 149 Fed. Cl. at 138 (2020) ("The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that an offeror will successfully perform and meet the needs of the agency on the contract at issue.") (collecting cases). The Court grants "an even greater degree of discretion" to the agencies in best value determinations between comparably competent offerors. *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013). The Army's assessment of the unique advantages of TCSI's proposal is well-documented, and DigiFlight's mere disagreements with the Army's assessment of strengths and price evaluation are not adequate grounds to overturn the Army's decision. *See CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717–18 (2012) ("The protester's mere disagreement with the agency's assessment is not 'nearly enough' to demonstrate arbitrary and capricious agency action.").

### E. Eligibility of TCSI's Proposal

In Count IX, DigiFlight argues that TCSI's proposal was ineligible for award because the company's BPA expired on January 4, 2023, prior to the award of the task order on February 21. (Pl.'s Mot. at 31–34; AR 36). The United States does not dispute that the BPA expired on January 4 and that the Army extended the BPA by modification eight days later. (Def.'s Reply at 20). DigiFlight first asserts that under FAR § 8.405-3(c)(2)(iii)(A)(2) this competition was limited to "holders of current BPAs." (Pl.'s Mot. at 31; *see also* AR 572 (subjecting the TRFQ to FAR 8.405-3 procedures)). DigiFlight's reading of FAR § 8.405-3(c)(2)(iii)(A) is too broad.

That provision states that the ordering activity shall (1) "[p]rovide an RFQ to all BPA holders," that offer the required supplies or service, and (2) "[a]fford all BPA holders responding to the RFQ an opportunity to submit a quote." FAR § 8.405-3(c)(2)(iii)(A). While FAR § 8.405-3(c)(2)(iii)(A) requires the agency to distribute the RFQ to all valid BPA holders and consider responses from valid BPA holders; it does not explicitly require that competition be limited to those that retain their current BPA throughout the process or that renewal disqualifies offerors.

*See Myriddian, LLC v. United States*, 165 Fed. Cl. 650, 654 (2023) (finding that retaining System for Award Management ("SAM") registration throughout the procurement was mandatory when FAR 52.204-7(b)(1) stated that offerors "shall *continue* to be registered . . . .") (emphasis added). Here, TCSI was a valid BPA holder and was afforded the opportunity to receive the RFQ, submit a quote, and have its submission reviewed by the Army. (Pl.'s Reply at 16, ECF No. 24 ("As a matter of background, all offerors were pre-qualified through a BPA competition.")).

DigiFlight nonetheless argues that the expiration of TCSI's competitively awarded BPA during the period of consideration and the Army's bilateral modification of that BPA violated CICA. 41 U.S.C. § 253. While the Court previously held that CICA bars the agencies from awarding BPAs when the vendor's underlying Federal Supply Schedule (FSS) contract has expired, *see e.g.*, *Arkray USA, Inc. v. United States*, 118 Fed. Cl. 129 (2014), the same does not apply to expired BPAs. This is because the Federal Circuit has held, as DigiFlight acknowledges, that a BPA is not a contract. *Crewzers Fire Crew Transport, Inc. v. United States*, 741 F.3d 1380 (Fed. Cir. 2014). The Federal Circuit further noted that BPAs are "frameworks for future contracts," which do not impose any contractual obligations on the United States or the vendor. *Id*. at 1383. As such the Army's extension of TCSI's BPA did not run afoul of CICA's requirement for full and open competition.

BPAs are not comparable to enforceable contracts because they lack (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the Government's representative to bind the Government in a contract. *Id*. at 1387. DigiFlight attempts to distinguish the Federal Circuit's prior decisions by arguing that specific facts of this case render this BPA a contract. (Pl.'s Mot. at 33). For example, DigiFlight points to the text of the BPA which reads: "This BPA is issued with the understanding that it constitutes an agreement to effect the rights of the parties *in the event* the contractor is solicited and/or awarded a task order." (Pl.'s Mot. at 33–4 (emphasis in original); *see also* AR 146). DigiFlight adds that in this case "the very fact that TCSI has been solicited to respond to multiple TORFQs is 'the event' that constitutes the BPA becoming an agreement." (Pl.'s Mot. at 34). This is not enough to overcome the strong presumption that the Army "is not required under the terms of the BPAs to place any orders," or that the vendor remains "perfectly free not to accept any orders at all," both of which defeat the presumption that a BPA agreement can qualify as a contract. *Crewzers*, 741 F.3d at 1383; *see also McLeod Group, LLC v. United States*, 840 Fed. Appx. 525 (Fed. Cir. 2020) (finding that BPAs are different from contracts because they create no performance obligations); *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 203 (Fed. Cir. 1992) (same). The Court rejects Count IX because the BPA in this case was not subject to CICA's terms, therefore temporary expiration of TCSI's BPA did not render it ineligible for award.

F.   *The Army's assignment of strengths*

Counts X and XI refocus on the strengths assigned to TCSI. (Pl.'s Mot. 34–8). The Army evaluators assessed TCSI's proposal with a strength for using an "Operations Chief" in a management role to attend weekly meetings and, through communication with other senior leaders, oversee the overall execution of tasks. (AR 1327–28). DigiFlight argues that the Army erred by awarding TCSI a contract that does not incorporate by reference TCSI's technical

12

proposal. (Pl.'s Mot. at 35). On this basis, DigiFlight argues that TCSI is not "contractually obligated" to provide an Operations Chief. (*Id.*). DigiFlight finds further support for this argument in the fact that TCSI's Basis of Estimate does not include an Operations Chief. (*Id.*). DigiFlight also calls into question TCSI's second strength—its ability to coordinate events and interact with the industry leaders—arguing that the Army improperly awarded that strength as well because it is "inextricably tied" to the position of Operations Chief. (*Id.* at 37–8). DigiFlight contends that certain statements in TCSI's proposal highlight how the Army's assignment of the second strength is just an indirect endorsement of the Operations Chief role. (*Id.*).

DigiFlight does not identify any source of authority mandating the Army to incorporate TCSI's technical proposal into the contract awarded or establish why deviations from the proposal in post-award performance can retroactively invalidate the Army's evaluation of the proposals. In bid protest cases, the Court's "duty [is] to determine whether the agency's [eligibility] analysis was consistent with the evaluation criteria set forth in the [request for proposals ("RFP")], not to introduce new requirements outside the scope of the RFP." *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (citations omitted). Here, while the Army found merit in TCSI's proposal to use an Operations Chief, the solicitation did not require offerors to supply an Operations Chief. (AR 580–4). The Army only found that the potential use of an Operations Chief could exceed the minimum PWS 2.2.5 requirement of providing senior executive level support and that TCSI would be capable of providing that option. (AR 914–20).

The Court accepts the "generally standard practice in government procurements" that agencies "rationally rely[] on the representations and documentation provided," by the offerors. *Allied Tech. Grp., Inc. v. United States,* 649 F.3d 1320, 1330 (Fed. Cir. 2011). As such, the Army's eventual decision whether to use the Operations Chief pertains to contract administration, not to compliance with the exact terms of the solicitation. *Allied Tech.,* 649 F.3d at 1330 (finding that the offeror's potential failure to comply with proposal requirements is ordinarily "a matter of contract administration which does not go to the propriety of accepting the bid."). DigiFlight points to the Government Accountability Office ("GAO") decision in *A&D Fire Protection*, B-288852.2, 2002 U.S. Comp. Gen. LEXIS 53 (May 2, 2002), where the GAO sustained the protest because the agency erroneously assessed a strength for an accelerated schedule when the awardee was not contractually bound to perform the accelerated schedule. But in that case, the offeror's accelerated schedule commitment was explicitly required by the RFP, which stated that "[t]he Offeror will provide a written commitment as to the time frame (number of days after receipt of the notice to proceed) within which the Offeror will guarantee completion." *Id.* at 2. Therefore, the offeror's deviation from the proposed schedule was tantamount to disregarding the solicitation's requirements. *Allied Tech. Grp., Inc.*, 649 F.3d at 1329 ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable, and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.") (quoting *E.W. Bliss*, at 448). Because inclusion of an Operations Chief was not an explicit proposal requirement, this case is more similar to *Golden IT, LLC v. United States*, 157 Fed. Cl. 680 (2022). There, the Court found that the departure of a "key personnel for the BPA work," from the awardee's company did not retroactively render the awardee's proposal invalid because the awardee "had a reasonable basis," to include the key personnel in its proposal at the time of the submission. *Id.* at 701–3.

13

The information included in TCSI's Basis of Estimate does not undermine the technical acceptability of its proposal because, as the United States notes, those estimates are in response to the TORFQ request to provide the "*minimum* labor requirements." (*See* AR 575 (emphasis added)). As such, the offerors remained free to propose labor categories additional to the minimum requirements, like TCSI's Operations Chief. Accordingly, the Court finds that the Army did not err by relying on TCSI's representations about the benefits of an Operations Chief (TCSI's first strength). Having found that the Army did not err in assigning the first strength, the Court also rejects DigiFlight's argument that TCSI's second strength should be nullified based on being "inextricably tied" to its first strength.

### G. The Army's evaluation of other proposals and its trade-off analysis

DigiFlight's Counts XII and XIII challenge the Army's evaluation of other offerors' proposals and the ultimate trade-off analysis. (Pl.'s Mot. 39–41). DigiFlight first emphasizes that all the offerors in this case are BPA holders for AMCOM EXPRESS and were "highly qualified" after being screened through a competitive process. (*Id*. at 41). Given this background, DigiFlight argues that the Army's failure to assign any other offeror a strength borders on a theoretical impossibility. (*Id*. at 44).

DigiFlight argues that "[t]he AR must affirmatively evidence conduct of the required analysis." (*Id*. at 39). DigiFlight relies on GAO's decision in *Systems Research and Applications Corporation; Booz Allen Hamilton, Inc.*, B-299818.2, September 6, 2007, to claim that the Army must "distinguish the[] relative quality under each stated evaluation factor by considering the degree to which technically acceptable proposals exceed the stated minimum requirements or will better satisfy the agency's needs." (*Id*. at 40).

Even if TCSI was entitled to these strengths, DigiFlight claims that the Army violated FAR § 8.405-3(a)(7)(viii) which requires "the rationale for any tradeoffs in making the selection." The Army instead, DigiFlight argues, conducted a "superficial tradeoff only" one that "discusses TCSI's strength in the abstract and not the actual differences between the proposals." (Pl.'s Mot. at 42). Here again, DigiFlight recites aspects of its proposal presented to the Army and asserts that it "objectively offered comparable expertise as to the core of TCSI's second strength," and was therefore owed the Army's analysis distinguishing the two approaches. (*Id.* at 43). DigiFlight invites the Court to analyze "the quotations from DigiFlight's proposal," and make its own determination as to if the difference between the two proposals can be reduced to only a "modest benefit in experience in managing conferences, ceremonies, and events," and if so, if that "modest benefit" is "worth $16.7 million" in a price premium. (*Id.*). Once again, DigiFlight's arguments fly in the face of the Court's repeated and emphatic holding that best value tradeoffs under FAR subpart 8.4 are not judged with the standards applying to those under FAR Part 15. *Integrated Fin,* 161 Fed. Cl. at 491–2 (refusing to apply FAR Part 15 standards in a FAR Part 8 procurement); *see also Matt Martin Real Est. Mgmt., LLC v. United States*, 96 Fed. Cl. 106, 116 (2010) ("FAR Subpart 8.4 and FAR Part 15 are different provisions with different purposes. The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15."). As discussed, the record before the Court reflects adequate documentation of the Army's needs and the advantages of each offeror's proposal. The record fails to support DigiFlight's argument that the trade-off analysis was insufficient.

### III. Conclusion

Despite the apparent vigor of DigiFlight's motion for judgment on the administrative record (raising 13 counts), each of DigiFlight's claims in some form attempts to uproot well-established holdings: that the agency is better suited than the Court to conduct technical evaluations in the context of best-value assessments; that FAR's multifarious requirements for negotiated procurements do not apply to simpler acquisitions; and that, in most cases, an agency is not required to extrapolate on why it finds aspects of proposals acceptable and adequate. In reviewing best-value determinations, the Court's role is not to conduct a forensic exam but to merely review the agency's method and execution. The record before the Court does not evince deviations from the applicable FAR provisions controlling this specific type of procurement. Disappointed bidders are bound for more disappointment if they seek closure in this Court for what amount to agencies' discretionary determinations.

As such, the Court **DENIES** DigiFlight's motion for judgment on the administrative record, (ECF No. 20), and **GRANTS** the United States' cross-motion for judgment on the administrative record, (ECF No. 22). The Clerk is **DIRECTED** to enter judgment accordingly.

The parties shall meet and confer and file a joint status report proposing redactions to the memorandum opinion by **August 25, 2023,** to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge